IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>CHG US Holdings LLC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-10851 (MFW)<br><br>Joint Administration Requested |

### DECLARATION OF STEVEN SALM IN SUPPORT OF FIRST DAY RELIEF

I, Steven Salm, hereby declare as follows:

1. I am the president and chief executive officer ("CEO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Planta").

2. As the Debtors' CEO, I am generally familiar with each of the Debtors' businesses, day-to-day operations, financial affairs, and books and records. Except as otherwise indicated, the statements set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents, information supplied to me from the Debtors' advisors, or my own opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this declaration.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are as follows CHG US Holdings LLC (9685); PLANTA Bethesda LLC (5177); PLANTA Brooklyn LLC (4261); PLANTA SOHO LLC (5947); PLANTA Nomad LLC (2226); PLANTA DC LLC (7448); PLANTA P Street LLC (2713); PLANTA KROG LLC (6124); PLANTA Denver LLC (1868); PLANTA WEHO LLC (2741); Planta West Palm Beach LLC (1752); PLANTA Miami Beach LLC (6454); PLANTA River North LLC (5587); PLANTA CocoWalk GP LLC (5347); PLANTA FLL LLC (6245); PLANTA Buckhead LLC (6467); PLANTA Brentwood LLC (7390); and PLANTA Marina LLC (6511). The Debtors' mailing address is 850 Commerce Street, Miami, FL 33139.

3. On May 12, 2025 (the "Petition Date"), the Debtors filed voluntary petitions commencing these chapter 11 cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4. The Debtors continue to operate their businesses and manage their affairs in the ordinary course of business as debtors in possession. The Debtors have filed various motions identified herein requesting "first day" relief. I submit this declaration in support of such first day relief, as well as to provide support for, and background concerning, the Chapter 11 Cases and other pleadings filed or expected to be filed in this case.

I. OVERVIEW OF THE DEBTORS' BUSINESSES AND FINANCIAL AFFAIRS

A. The Debtors' Businesses

5. The Debtors operate a chain of vegan restaurants in Florida, Georgia, California, New York, Illinois, California, District of Columbia, and Maryland, and wholly own non-debtor affiliates that have operations in Toronto, Canada. Founded in 2016, Planta is known for providing guests with an exceptional dining experience featuring high quality, seasonal, plant-based food and drinks that show off the power of vegetables. The full-service restaurant offers vegan renditions of sushi, burgers, ceviche, dumplings, and noodles.

6. Planta was created to expand the accessibility and acceptability of plant-based dining. Some of the Debtors' most popular product offerings are shown in the image below:



7. In total, gross sales for the Debtors have averaged over $40 million since their founding in 2016.

**B.     The Debtors' Capital Structure**

8. CHG US HOLDINGS LLC ("CHG Holdings") is the Debtors' parent company. CHG Holdings owns the intellectual property for each of the Debtors. All of the other Debtor entities are wholly owned by CHG Holdings.

9. As of the Petition Date, the Debtors have no secured creditors.

10. Most of the Debtor entities own and operate each of the Debtors' restaurant locations. Below is information regarding leases for each of the Debtors' locations:[2]

(a) PLANTA Bethesda LLC leases space at 4910 Elm Street, Bethesda, MD, 20814 (the "Maryland Restaurant"). The landlord of the Bethesda restaurant is Street Retail LLC.

(b) PLANTA Brooklyn LLC leases space at 316 Wythe Avenue, Brooklyn, NY 11249 (the "Brooklyn Restaurant"). The landlord of the Brooklyn restaurant is Grand/Wythe Owner LLC.

(c) PLANTA Nomad LLC leases space at 15 W. 27th Street, New York, NY 10001 (the "Manhattan Restaurant"). The landlord of the Manhattan Restaurant is 13 West 27 Leasehold LLC.

(d) PLANTA DC LLC leases space at 1200 New Hampshire Avenue NW, Washington, DC 20036 (the "DC Restaurant"). The landlord of the DC Restaurant is New Hampshire Avenue Holdings LLC.

(e) PLANTA P Street LLC leases space at 1460 P Street, Washington, DC 20005 (the "P Street Restaurant"). The landlord of the P Street Restaurant is 1454 P Street LLC.

(f) PLANTA Krog LLC leases space at 99 Krog Street NE, Suite Y, Atlanta, GA 30307 (the "Atlanta Restaurant"). The landlord of the Atlanta Restaurant is AP Krog Street, LLC.

---

[2] There are three (3) debtor entities that do not operate restaurant locations and are thus excluded from this list. PLANTA Denver LLC (1868) and PLANTA WEHO LLC (2741) are each parties to leases, but restaurant locations have not been funded or built. The landlord for PLANTA Denver LLC is RiNo (Edens), LLC. The Landlord for PLANTA WEHO LLC is 8461 Melrose Avenue, LLC. PLANTA SOHO LLC (5947) is no longer a party to a lease and has not been funded or built.

(g) PLANTA West Palm Beach LLC leases space at 700 S Rosemary Avenue, Suite 142, West Palm Beach, FL 33401 (the "West Palm Beach Restaurant"). The landlord of the West Palm Beach Restaurant is CityPlace Retail, LLC.

(h) PLANTA Miami Beach LLC leases space at 850 Commerce Street, Miami Beach, FL 33139 (the "Miami Beach Restaurant"). The landlord of the Miami Beach Restaurant is Limestone PLANT, LLC.

(i) PLANTA River North LLC leases space at 413 N. Clark Street, Chicago, IL 60654 (the "Chicago Restaurant"). The landlord of the Chicago Restaurant is 413-419 N. Clark Retail Tenant, LLC.

(j) PLANTA CocoWalk GP LLC leases space at 3015 Grand Avenue, Suite 201, Coconut Grove, FL 33133 (the "Coconut Grove Restaurant"). The landlord of the Coconut Grove Restaurant is FRIT Cocowalk Owner, LLC.

(k) PLANTA FLL LLC leases space at 1201 E Las Olas Boulevard, Ft. Lauderdale, FL 33301 (the "Ft. Lauderdale Restaurant"). The landlord of the Ft. Lauderdale Restaurant is ELO Investments 2, LLC.

(l) PLANTA Buckhead LLC leases space at 3013 Bolling Way, Atlanta, GA 30305 (the "Buckhead Restaurant"). The landlord of the Buckhead Restaurant is JPPF Buckhead Village, L.P.

(m) PLANTA Brentwood LLC leases space at 11754 San Vicente Boulevard, Los Angeles, CA 90049 (the "Brentwood Restaurant"). The landlord of the Brentwood Restaurant is GPI Companies.

(n)  PLANTA Marina LLC leases space at 4625 Admiralty Way, Suite 104, Marina Del Rey, CA 90292 (the "Marina Del Rey Restaurant"). The landlord of the Marina Del Rey Restaurant is Pacific Marina Venture, LLC.

## II.  EVENTS LEADING TO FILING THE CHAPTER 11 CASES

11. The Debtors experienced significant success early in their existence. This success led to rapid growth from roughly $3.5 million in sales in 2016 to more than $46 million in 2024.

12. Of course, like countless other companies in the food services industry, the Debtors did not anticipate the unprecedented disruption to the restaurant business caused by the spread of the novel coronavirus disease 2019 ("COVID-19"). COVID-19 dramatically impacted the restaurant industry due to quarantine mandates, which had the impact of: (1) closing in-store locations; (2) negatively affecting restaurant sales; and (3) forcing businesses to change how their organizations fundamentally operated, including significantly greater reliance on food delivery apps to generate business, which had the effect of substantially increasing the Debtors' cost structure. The Debtors' businesses were similarly negatively affected by the impact of COVID-19, with store traffic and revenues suffering irrecoverable damage.

13. The Debtors raised growth equity three (3) months before the onset of COVID-19, resulting in a significant delay in expansion given the Debtors' commitment to leases and inability to complete construction, secure materials, and hire staff while the restaurant industry experienced extraordinary challenges. These delays to expansion ultimately triggered inefficiency and reliance upon quick capital for the business to grow into its footprint of signed leases.

14. Even as COVID-19's most severe effects subsided, consumer slowdown began in late 2023 and early 2024 given rising prices. Inflation in the market caused fewer

consumers to go to restaurants, and wage inflation caused the Debtors to incur higher wage costs internally. Commodity prices for many of the Debtors' key inputs, including fresh produce and other food products, have also seen remarkable price increases, resulting in further pressure on the Debtors' businesses. In an effort to mitigate the impact of these pressures on cash flow, the Debtors were compelled to increase prices for their products, which had a further negative impact on customer traffic. This tightened the Debtors' model more than it had in the past, because employees were entitled to higher wages while inflation caused an impact on consumer sentiment and spending. To that end, the Debtors entered into a convertible note purchase agreement (the "Convertible Note") with Anchorage Illiquid Opportunities Master VI (B) L.P. ("Anchorage"), with a maturity date of March 31, 2025. The Convertible Note helped to address short-term liquidity needs.

15. While the Debtors have adjusted as much as possible to this new reality (and cash flow has steadily improved), the Debtors are still recovering from the financial burdens of a condensed and rapid construction schedule of 12 restaurants in 3 years, and new business realities that resulted from COVID-19, inflation, and a resulting shift in consumer behavior.

16. As part of their efforts to manage cash flows, the Debtors began discussions in Q3 of 2024 toward a goal of shrinking their portfolio, exiting underperforming leases, and maximizing capital structure. The Debtors began negotiations with certain of their landlords to negotiate exits and amended commitments. Simultaneously, the Debtors began exploring fundraising for additional capital.

17. Meanwhile, the Convertible Note maturity date was fast approaching. The Debtors began to explore financing alternatives from various sources. Between September 2024 and April 2025, the Debtors engaged in negotiations to reach a solution around securing capital,

all while being unable to meet the company's financial obligations. The Debtors' board was presented with options and terms that it could not agree upon. In January 2025, the Debtors became less current with their landlords, which was made even more difficult by the fact that restaurants, as a general matter, experience less foot traffic during that month.

18. Notwithstanding the aforementioned attempts to balance cash flow, the financial headwinds the Debtors have faced have made it nearly impossible to continue operations in light of the Debtors' existing obligations, and financial restructuring has become necessary through these cases. In connection therewith, in late April 2025, the Debtors retained Pashman Stein Walder Hayden, P.C. to serve as their counsel. On May 6, 2025, the Debtors' board voted to file these Chapter 11 Cases.

19. The Debtors are actively negotiating with a potential DIP lender and hope to enter into a DIP facility early in these Chapter 11 Cases to fund a sale process of substantially all of the Debtors' assets.

20. The Debtors file these cases with the goal of right-sizing their balance sheets, selling substantially all of their assets to maximize value for their creditor base and, hopefully, confirming a plan of liquidation soon thereafter. The Debtors look forward to working with their creditors, vendors and other parties in interest as they chart a path to restructuring their balance sheet, realizing their full economic potential for the future, and continuing to provide their customers with the delicious meals they desire for years to come.

### III.  FIRST DAY MOTIONS

21. Substantially contemporaneous with the filing of their chapter 11 petitions, the Debtors have filed or intend to file a number of motions identified herein requesting "first day"

relief (the "First Day Motions") that the Debtors believe are necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.

22. The facts set forth in the First Day Motions are incorporated herein in their entirety. The Debtors request that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during, the pendency of these Chapter 11 Cases.

23. I have reviewed each of the First Day Motions, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtors' personnel and advisors. To this end, the Debtors have filed, or soon will file, the following First Day Motions:

   i. *Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases*

   ii. *Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to Redact Certain Personal Information*

   iii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use the Cash Management System, (B) Continue to Use Existing Payment Methods, and (C) Continue to Use Corporate Purchase Cards; (II) Authorizing the Debtors to Maintain and Continue to Use Existing Business Forms Without Reference to their Status as Debtors in Possession; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief*

   iv. *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Policies and Agreements Relating Thereto Entered Into Prepetition and Pay Prepetition Obligations in Respect Thereof, (B) Renew, Revise, Extend, Supplement, Change or Enter Into New Insurance Coverage as Needed in Their Business Judgment, (C) Honor Prepetition Premium Financing Agreements, (D) Renew and Enter Into New Insurance Premium Financing Agreements in the Ordinary Course of Business, (E) Maintain Bonds, and (F) Continue to Pay Broker Fees; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*

   v. *Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Taxes and Fees*

  vi. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages, Benefits and Other Compensation Obligations, (II) Authorizing Financial Institutions to Honor All Obligations Related Thereto, and (III) Granting Related Relief*

  vii. *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Approving Proposed Adequate Assurance of Payment to Utility Providers, and Authorizing Debtors to Provide Additional Assurance, (III) Establishing Procedures to Resolve Requests for Additional Assurance and (IV) Granting Related Relief*

  viii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor and Continue Certain Customer Programs and (II) Granting Related Relief*

  ix. *Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and (II) Granting Related Relief*

  x. *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105(a), 363, 541, 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Payment of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related to the Foregoing*

  xi. *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent*

24. It is my belief that the relief sought in each of the First Day Motions is necessary for a successful reorganization and to maximize creditor recoveries. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, *i.e.* the First Day Motions seeking relief related to the Debtors' obligations to their insurers, taxing authorities, customers, critical vendors and banks, the relief requested is essential to avoid immediate and irreparable harm to the Debtors' estates. The success of these Chapter 11 Cases depends upon the Debtors' ability to maintain their operations, maximize estate value, and successfully confirm a plan of reorganization. The relief requested in the First Day Motions is a critical component of

maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful chapter 11 process.

## **CONCLUSION**

25. I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: May 13, 2025
Miami, FL

*/s/ Steven Salm*
Steven Salm